IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
In re:                                                       : Chapter 11
                                                             :
NATROL, INC., *et al.*,                                      : Case No. 14-11446 (BLS)
                                                             :
    Debtors.[1]                                            : (Joint Administration Requested)
                                                             :
------------------------------------------------------------x

**DECLARATION OF MESROP G. KHOUDAGOULIAN IN SUPPORT OF THE
DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

I, Mesrop G. Khoudagoulian, hereby declare, pursuant to section 1746 of title 28 of the United States Code, as follows:

1. I am over eighteen (18) years of age and if called upon I would competently testify to the matters set forth herein from my own personal knowledge, except as otherwise stated. I am the Chief Executive Office, General Counsel and Secretary of Natrol, Inc. ("Natrol"), Natrol Holdings, Inc. ("Natrol Holdings"), Natrol Products, Inc. ("Natrol Products"), Natrol Direct, Inc. ("Natrol Direct"), Natrol Acquisition Corp. ("Natrol Acquisition"), Prolab Nutrition, Inc. ("Prolab"), and Medical Research Institute ("MRI") (collectively, the "Debtors").

2. On June 11, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

3. I submit this Declaration in support of the Debtors' voluntary petitions and "first day" motions and applications filed with the Bankruptcy Court in these chapter 11 cases (the "Chapter 11 Cases"). Except as otherwise indicated, all facts set forth in this Declaration are

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Natrol, Inc. (0780); Natrol Holdings, Inc. (4614); Natrol Products, Inc. (7823); Natrol Direct, Inc. (5090); Natrol Acquisition Corp. (3765); Prolab Nutrition, Inc. (3283); and Medical Research Institute (2825). The Debtors' principal offices are located at 21411 Prairie Street, Chatsworth CA 91311.

01:15592117.1

based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge, and/or information provided to me in reports concerning the operations and financial affairs of the Debtors. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

4.  This Declaration is intended to provide a summary overview of the Debtors and these Chapter 11 Cases by providing a description of the Debtors' organizational structure, businesses, and liabilities, as well as the circumstances giving rise to the commencement of the Chapter 11 Cases.

## I. BACKGROUND

5.  This is a case of misunderstandings, miscommunications, and misperceptions that have unfortunately caused the deterioration of the relationship between Cerberus Business Finance, LLC (together with its affiliates, "Cerberus"), a lender, and the Debtors. The Debtors' businesses are profitable, and the Debtors project that their businesses will continue to grow and remain profitable. However, as discussed more fully below, the Debtors were required to seek bankruptcy protection as a result of several technical defaults under a loan agreement (the "Prepetition Credit Agreement"). The Debtors intend to effect a successful restructuring and emerge from chapter 11 as soon as possible.

6.  During 2011-2012, the Debtors were having severe problems with some of their major manufacturers. Because of the negative impact on the Debtors' business, their management team decided to embark on a substantial capital expenditure to open new production lines allowing the Debtors to make their most profitable products in-house. This effort was intended to address quality control problems with their existing suppliers and to

substantially improve profitability.

7. In pursuit of this goal, the Debtors hired Imperial Capital, LLC ("Imperial") to identify financing sources. Imperial conducted an extensive search process and made extensive disclosures regarding the business and the anticipated capital expenditures to a variety of potential financing sources. Among the many lenders who responded to that inquiry, was Cerberus. Cerberus conducted extensive due diligence, hired an excellent law firm and negotiated a financing arrangement with the Debtors pursuant to which Cerberus (through a syndicate of affiliates and other parties) advanced $65 million under a term loan and made available an additional $10 million revolving credit facility (together, the "Prepetition Credit Facility"). According to the Prepetition Credit Agreement, the purpose of the Prepetition Credit Facility was to "refinance existing indebtedness of the [Debtors], to finance manufacturing facility expansion, for other general working capital purposes of the [Debtors] and to pay fees and expenses related to this [Prepetition Credit Agreement]."

8. In connection with these negotiations, the Debtors clearly articulated the Debtors' plan to build out new manufacturing facilities and spend $25 million on the project. Cerberus agreed not to impose any substantive limitations on the Debtors' ability to make capital expenditures. The Prepetition Credit Agreement itself said virtually nothing about limits on the Debtors' capital expenditures.

9. Shortly after closing the loan, the Debtors entered into an agreement with Fabtech Technologies International, Ltd. ("Fabtech"), a major Indian manufacturer of turnkey solution providers to the pharmaceutical industry with in-house design, engineering, construction and manufacturing capacity for equipment and solutions. Natrol's parent, Plethico Pharmaceuticals Limited ("Plethico"), had positive prior experiences with Fabtech in similar transactions prior to

01:15592117.1

the Manufacturing Agreement (defined below).

10. In exchange for substantial discounts in the fixed price contract awarded to Fabtech for construction of the Debtors' facilities, the Debtors agreed to pay for the anticipated work in advance pursuant to a written agreement (the "Manufacturing Agreement") executed by Natrol and Fabtech on or about March 5, 2013.

11. On or about March 5, 2013, the Prepetition Credit Agreement was also closed and funded. Fabtech, in cooperation with Natrol and Plethico, began to revise and finalize the plans for the build-out of the manufacturing facility.

12. Shortly thereafter, Cerberus raised questions regarding the wisdom and validity of the Fabtech arrangement. Cerberus stated that it had investigated Fabtech and was apparently unsatisfied with the information it received. Due to its concerns regarding Fabtech, despite the fact that the arrangement itself did not violate the Prepetition Credit Agreement, Cerberus began calling technical defaults on the Debtors only a few months after closing the Prepetition Credit Agreement, which over the past year has led inexorably to the point where the Debtors became subject to terms under the Prepetition Credit Agreement and a forbearance agreement (the "Forbearance Agreement") that they literally had no hope of performing.

13. In connection with the Forbearance Agreement, a variety of agents were placed into the Debtors' management structure who made it difficult for the Debtors to operate their businesses. For months, the Debtors have been unable to operate in any way reflecting a semblance of normalcy. Ultimately, the Debtors were charged with technical defaults and termination under the Prepetition Credit Agreement and Forbearance Agreement and were threatened with imminent foreclosure. Because of the threat of irreparable harm facing the

Debtors, and in an effort to reorganize their operations and repay all their creditors in full, the Debtors commenced this bankruptcy case and seek the Court's protection.

## II. ORGANIZATIONAL STRUCTURE

14. Natrol, a Delaware corporation with principal offices in Chatsworth, California, is a leading producer of high-quality, branded nutritional and dietary supplements. Natrol is a wholly-owned subsidiary of Natrol Holdings, a Delaware corporation (created in connection with the Prepetition Credit Facility (defined below)).

15. Natrol Holdings is owned by Plethico Global Holdings B.V., a Netherlands company ("Plethico Global"), and Plethico US Holdings, Kft, a Hungary company ("Plethico US"). Plethico US is a wholly-owned subsidiary of Plethico Global. Plethico Global is a subsidiary of Plethico, a publicly traded global pharmaceuticals company based in India. Natrol had been publicly owned from 1998 until 2007, when it became a privately-owned subsidiary of Plethico. Plethico, Plethico Global, and Plethico US are not debtors in these Chapter 11 Cases.

16. Natrol owns 100% of the equity in (1) Natrol Products, a Delaware corporation located in Chatsworth, California; (2) Natrol Direct, a Delaware corporation; (3) Prolab, a Connecticut corporation; (4) MRI, a California corporation; and (5) Natrol Acquisition, a Delaware corporation. The headquarters of Natrol and the other Debtors is located in Chatsworth, California. Natrol also owns 100% of the equity in Natrol UK Ltd., a UK entity with no material assets that is in the process of being dissolved.

17. A chart depicting the Debtors' corporate structure is attached hereto as Exhibit A.

## III. THE DEBTORS' BUSINESS OPERATIONS

18. The Debtors are leading producers of high-quality, branded nutritional and dietary supplements. Collectively, the Debtors manufacture, market, and distribute dietary and

01:15592117.1

5

nutritional supplements and related products that address a wide range of preventative healthcare and condition-specific dietary, national, and performance needs. The Debtors have built a strong and loyal customer base throughout their more than 33 years in operation, with a dedication to delivering high-quality nutraceuticals that meet rigorous manufacturing quality controls and standards to guarantee all products are safe and effective.

19. Natrol is one of the world's leading manufacturers of dietary supplements, herbal teas, and sports nutrition products. Natrol produces and distributes certain product lines of nutritional and dietary supplements, including *Natrol, NuHair, Laci le Beau, Shen MIN*, and *Essentially Pure Ingredients*. Natrol Products conducts sales and marketing efforts for certain of Natrol's product lines. Natrol Acquisition is a non-operational company that was created for use in potential acquisitions. Natrol Direct manages e-commerce sales and distribution for all product lines produced by Natrol and its subsidiaries. Prolab produces and conducts sales and marketing efforts relating to the *Prolab* product line, a line of sports nutrition products that allow athletes to customize a nutritional supplement program to meet specific training and physique goals. Similarly, MRI produces and conducts sales and marketing efforts relating to the *MRI* product line, a line of sports nutrition products with advanced delivery technology designed to create safe and advanced performance products.

20. The Debtors' parent company, Plethico, which is not a debtor in these Chapter 11 Cases, produces pharmaceutical and allied healthcare products in the nutraceuticals and herbal segments in India and internationally. In addition to its equity investments in the Debtors, Plethico also provides research and development in support of the Debtors' products. Plethico also markets and distributes the Debtors' products internationally through one of its indirect subsidiaries.

21.     The Debtors' product portfolio includes approximately 115 products, which are distributed through direct customer sales in addition to a retailer network of over 50,000 retailers, including natural and health food stores, specialty health retailers, mass market/club stores, online retailers, and through international distribution channels.  The products regularly receive accolades and cover features in major industry publications, have received consistent mention in mainstream press, and are used by a number of high-profile celebrities.  Despite the economic downturn over the last several years, the Debtors have achieved steady, organic growth, including net sales of approximately $94.9 million and adjusted EBITDA of approximately $16.1 million in 2013.  The Debtors have broken $10 million in monthly sales four times in the last nine months, including over $12 million in sales in March 2014.  The Debtors' revenues continue to trend upward, and the Debtors project continued growth in sales and positive cash flow.

22.     Based upon the Debtors' EBITDA of approximately $16.1, I believe that the Debtors have an enterprise value of approximately $160 million to $193 million.  Based upon my knowledge and experience of the Debtors' industry, I believe a multiplier of ten (10) to twelve (12) times EBITDA is commonly used to determine the enterprise value of companies in the industry.  For example, I am informed that Schiff Nutrition International was purchased by Bayer Healthcare for an enterprise multiplier of approximately thirty-three (33) in 2012.  Below are recent transactions in the industry, and the correspond multipliers:

| Date | Acquiror | Target | Target Business Description | Enterprise value | Multiplier |
|---|---|---|---|---|---|
| April 2012 | Schiff Nutrition International | Airborne | Provides immune support supplements through chewable tablets | $150 M | 9.3x |
| March 2012 | P&G | New Chapter Organics | Produces organic whole-food vitamin, mineral and herbal supplements | $134 M | 10.0x |

| Feb 2012 | Pfizer | Alacer Corp. | Develops, manufactures and markets dietary supplements and nutritionally enhanced products | $315 M | 15.0x |
| --- | --- | --- | --- | --- | --- |
| Feb 2011 | DSM | Marteck Life Enriched | Develops, produces and sells nutritional products that promote health and wellness | $1,087 M | 8.3x |
| Jan 2011 | Glanbia Consumer Foods | BSN | Manufactures and markets sports nutrition products | $144 M | 8.3x |
| Oct 2010 | The Carlyle Group | NBTY | Engages in the manufacture, marketing, distribution and retailing of vitamins and nutritional supplements | $4,078 M | 7.9x |
| | | | | Average multiplier | 13.2x |

23.     Based upon the foregoing, I believe that the Debtors have an enterprise value of approximately $160 million to $193 million.

24.     Moreover, the Debtors are continuing to work to introduce new products, complete clinical trials with respect to certain products, and invest in marketing efforts to increase their sales and increase their market share of a growing industry.

25.     The Debtors have approximately 215 employees. Most of their employees assist with production and operations. All products are manufactured in-house, with the exception of protein powders, soft gels, liquid products, and herbal teas (which collectively represent approximately 17% of gross sales). Because of the Debtors' control and oversight of production, the Debtors enjoy a strong reputation for quality ingredients and maintain a loyal consumer following.

26.     As discussed above, the Debtors are also currently constructing four new manufacturing lines within their Chatsworth facilities, which will enable the Debtors to produce protein powder, soft gels, tea, and bottles. The powder line is expected to be completed in

October 2014, with all four new lines to be completed by 2015. The manufacturing facility expansion will enable the Debtors to bring substantially all of their production in-house, thereby providing maximum control over quality and the supply chain. Moreover, the Debtors anticipate seeing a significant return on their investment based on cost savings on production of existing product lines.

## IV. THE DEBTORS' LIABILITIES

27. As of the Petition Date, on a consolidated basis, the Debtors had liabilities of approximately $86 million, excluding contingent liabilities that might arise from the rejection of executory contracts.

28. The bulk of the Debtors' liabilities arise from a 2013 credit facility with Cerberus. In March 2013, the Debtors obtained from Cerberus a $65 million term loan plus an additional $10 million revolving credit facility in March 2013 (together, the "Prepetition Credit Facility"). The primary purposes of seeking debt financing were to (a) repay $34 million of debt that Plethico had incurred to finance its acquisition of the Debtors in 2007 and (b) undertake a $25 million expansion of their manufacturing facilities, which is described above. As of the Petition Date, Cerberus asserts that the Debtors owe Cerberus approximately $70 million in connection with the Prepetition Financing Agreement, exclusive of any reductions from cash sweeps or otherwise, and without taking into account any claims or offsets that the Debtors have against Cerberus. The Debtors' remaining liabilities are comprised of trade payables, accrued expenses, and other liabilities incurred in the ordinary course of business.

## V.  EVENTS LEADING UP TO THE CHAPTER 11 CASES

### A.  Generally

29. Shortly after closing the Prepetition Credit Agreement with Cerberus, the Debtors reached an agreement with Fabtech to provide an upfront payment of $25 million (the "Prepayment") to Fabtech, the contractor that the Debtors selected to build their new production facilities. While the Debtors had originally planned to pay for the build-out over time, the business decision to prepay for the lines was justified by Fabtech's agreement to deliver an additional fourth production line at no additional cost in return for receiving prepayment for the full contracted amount at the outset. Cerberus disagreed with the Debtors' decision to issue the Prepayment (rather than Debtors paying for the expansion over time); however, the Prepayment did not constitute a default under the Prepetition Credit Agreement. Indeed, Cerberus was well aware that the Debtors intended to utilize $25 million of the Prepetition Credit Facility for expansion of their production facilities, and Cerberus had not imposed conditions over the timing of the Debtors' payments.

30. Following the Prepayment to Fabtech, the Debtor's former Chief Financial Officer ("CFO") inadvertently failed to file the first required financial compliance certificate under the Prepetition Credit Agreement. This oversight resulted in a technical breach of the financial reporting covenant in April 2013, and Cerberus required the Debtors to begin paying default interest at a rate of 12.75% under the Prepetition Credit Agreement.

31. Given the disruption caused by the failure to file the first required compliance certificate, the Debtors terminated the prior CFO in May 2013. Due to the termination of the prior CFO and the subsequent attendant adjustment period, the Debtors' auditors were not notified in a timely fashion of the May 31, 2013 audit reporting deadline in the Prepetition Credit

Agreement. Upon completion of the audit, the 2012 audit included a going concern exception due to the classification of the Prepetition Credit Facility as a current liability (given the prior breach of the financial reporting covenant). This resulted in a further breach of the financial reporting covenant under the Prepetition Credit Agreement.

32. In addition to the technical defaults under the financial reporting covenants, the Debtors triggered breaches under fixed charge and senior leverage ratio covenants based on a misunderstanding of the definition of EBITDA in the Prepetition Credit Agreement. The Debtors' management believed that certain non-recurring legal expenses should be added back to EBITDA based on such treatment in the prefunding term sheet from Cerberus, while Cerberus did not include this in the definition of EBITDA in the Prepetition Credit Agreement (resulting in a $2.3 million difference in calculation of 2013 EBITDA). This discrepancy, along with the on-going payment of default interest, resulted in the Debtors breaching the fixed charge and senior leverage ratio covenants in December 2013.

33. After Cerberus declared a default under the Prepetition Credit Agreement, it froze the Debtors' main operating account—causing the Debtors' checks to vendors to bounce—and began sweeping cash from their main deposit account. Vendors began to question the Debtors' operations, shortened terms of payment, and some have required prepayment. The combined effect has been devastating to the Debtors' cash flow and their ability to maintain adequate liquidity.

34. Nevertheless, since Cerberus declared a default, the Debtors have remained current on all payments under the Prepetition Credit Agreement.

B.     **Prepetition Restructuring Efforts**

35.    In the wake of certain oversights that resulted in the technical defaults under the Prepetition Credit Agreement, the Debtors instituted a number of changes to address the situation, including key management changes to improve oversight of the Debtors.

36.    For example, in early 2014, in order to revamp and optimize the Debtors' sales and marketing efforts, the Debtors hired a new Vice President of Domestic Sales and Marketing. The Debtors also hired management consultants, which completed exhaustive reviews of the Debtors to bolster financial controls and enhance operational efficiencies.

37.    As part of a Forbearance Agreement entered into between the Debtors and Cerberus, the Debtors hired a new CFO in early 2014. The Debtors had hoped that he would implement rigorous financial controls to rectify prior deficiencies, institute expense monitoring and control mechanisms, and establish a new budgeting process. However, the new CFO proved to be unreliable; misled the Debtors' board of directors with respect to his negotiations with Cerberus; disregarded the Debtors' board of directors' requests; failed to provide critical information to the Debtors' board, officers, and other professionals; and was obstructive and otherwise uncooperative with the Debtors' restructuring professionals. Therefore, on June 9, 2014, he was terminated.

38.    Also as part of the Forbearance Agreement, an individual was installed as the Chief Business Officer ("CBO"), who was to oversee and monitor the Debtors' operations and provide reports to Cerberus. The CBO was similarly obstructive with the Debtors' professionals, failed to attend board meetings despite advance requests to attend, and failed to report to the board on a weekly basis as required by his engagement letter. Therefore, on June 9, 2014, the CBO was also terminated.

39.     Prior to the Petition Date, on or about June 6, 2014, John T. Young, Jr. from Conway MacKenzie, Inc., was installed as the Debtors' Chief Restructuring Officer. Since that time, Mr. Young has been assisting the Debtors in their restructuring efforts, and will assist the Debtors to emerge from chapter 11 as soon as possible.

**C.    Prepetition Marketing Efforts**

40.     In connection with the Forbearance Agreement, the Debtors agreed to engage in a marketing process in an effort to either (i) refinance the Prepetition Credit Facility or (ii) sell the Debtors' businesses. The Debtors and Cerberus agreed that the Debtors would either have an executed commitment letter from a party willing to purchase the Debtors or refinance the Prepetition Credit Facility by June 17, 2014. Therefore, the Debtors engaged Intrepid Investment Bankers, LLC ("Intrepid") to conduct the marketing process.

41.     After researching and contacting a broad set of financial and strategic parties, Intrepid received numerous indications of interest in April 2014. Although the process was not completed, Intrepid received expressions of interest for the Debtors well in excess of the Secured Parties obligations under the Prepetition Credit Agreement. While the terms of these indications of interest are generally confidential, they proposed purchase prices in the amount of $97 million to $120 million, as follows: (i) $97 to $113 million, (ii) $110 to $120 million, (iii) up to $110 million, and (iv) $97 to $113 million.

42.     Subsequently, the Debtors and Intrepid invited interested parties to management presentations and granted each of the parties access to a robust virtual data room. Following the completion of management presentations, Intrepid coordinated numerous due-diligence requests and sent out a process instruction letter to each of the remaining parties, establishing June, 17, 2014 as the final bid deadline. The remaining parties continued to perform due diligence, with a

number of parties having expressed strong interest and expending significant time and money on their diligence efforts.

### D. Termination of Forbearance Period and Acceleration of Prepetition Credit Facility

43. On June 6, 2014, while the marketing process was underway, Cerberus sent the Debtors a *Notice of Event of Default; Termination of Forbearance Period; Exercise of Remedies in respect of Collateral* (the "Termination Notice"), pursuant to which Cerberus accelerated the Prepetition Credit Facility. In the Termination Notice, Cerberus stated that because the Debtors' 2013 audited financial statements had not been delivered by May 15, 2014, as required under the Prepetition Credit Agreement, Cerberus was terminating the forbearance period under the Forbearance Agreement. Accordingly, Cerberus expressed its intention to begin exercising remedies immediately with respect to pledged collateral under the Prepetition Credit Agreement.

44. In order to prevent irreparable harm that threatened the Debtors and their stakeholders, and in an effort to reorganize their operations and repay all their creditors in full, the Debtors commenced these Chapter 11 Cases.

### VI. ANTICIPATED DIP LOAN FACILITY

45. The Debtors are currently in the process of negotiating a DIP Term Sheet with a prospective post-petition lender. The Debtors anticipate that the Secured Parties' claim will be satisfied and replaced by post-petition term loan and revolving credit facilities.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 17, 2014

_____
Mesrop G. Khoudagoulian

# EXHIBIT A

## Organizational Chart

